**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:22-cr-00166 (BAH)** |
| **JOHN GEORGE TODD III** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons herein, the government requests that this Court sentence John George Todd III ("Todd") to 151 months of incarceration, 3 years of supervised release, $4,514.68 in restitution, a mandatory assessment of $270. This recommendation reflects the low end of the government's calculated Sentencing Guideline range of 151 to 188 months' imprisonment.[1]

## I.     INTRODUCTION

The defendant, John George Todd III, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential

---

[1] The PSR calculates the defendant's guidelines range at 121-151 months. However, because the government believes the defendant inflicted Serious Bodily Injury against the victim in this case, an enhancement of +5 should be added to Count II under U.S.S.G. § 2A2.2(b)(3)(A). Therefore, the government calculates the resulting sentencing guidelines range as 151-188 month's imprisonment.

1

election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[2]

On January 6, 2021, Todd was angry that his preferred Presidential candidate would not be sworn into office. Frustrated that the former President and his supporters had "exhausted every fucking legal route," Todd was hellbent on disrupting the certification by illegal means, including by taking part in a violent riot and assaulting police officers who were trying to protect the Capitol building and members of Congress.

Between 3:10 p.m. and 3:17 p.m., after spending nearly an hour on restricted grounds and ignoring multiple warning signs that he should leave the area, Todd repeatedly pushed against police officers inside the Rotunda. Todd was instructed to leave multiple times, and in body worn camera footage ("BWC") obtained from the Metropolitan Police Department ("MPD") Todd was recorded yelling at law enforcement officers, "I swear to God, I'll hip toss your ass into the fuckin' crowd, mother fucker!"

MPD Officer Noah Rathbun[3], one of the officers attempting to clear the Rotunda, thought Todd was about to strike someone with his fiberglass tent pole and attempted to take the pole from

---

[2] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses because of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

[3] On January 6, 2021, Noah Rathbun was an Officer with the MPD. He has since been promoted to Sergeant.

Todd. Todd and Officer Rathbun pushed back and forth to gain control over the pole. While the two men wrestled over the fiberglass pole, the pole splintered. When the pole splintered, the officer and Todd both saw the splintered fiberglass, and Todd ripped the splintered pole out of Officer Rathbun's hands. This pulling sliced the officer's hand open at the knuckle. The cut was deep and exposed a tendon in his finger, requiring medical attention and stitches.

Todd was finally forced from the Rotunda and Capitol through the east doors at 3:18 p.m. He then proceeded to the Northwest Terrace. Over the next hour, Todd interacted with the crowd, and loudly stated, "We were inside yelling we need more people until they pushed us out," and shoved against police shields as law enforcement attempted to clear the Northwest Stairs at 4:42 p.m. By 4:50 p.m., Todd had moved towards the Lower West Tunnel, where police had engaged in an hours-long physical conflict with the crowd. Todd leaned off railings and observed the physical violence in the tunnel. Todd eventually exited the Capitol by walking west towards the National Mall, where he gave a video interview to a journalist.

The government recommends that the Court sentence Todd to 151 months' incarceration. This sentence is sufficient, but not greater than necessary, to reflect the severity of Todd's criminal actions and takes into account his lack of acceptance of responsibility.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Facts filed in this case, ECF No. 1, for a summary of the January 6, 2021 attack on the U.S. Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

**B.      Todd's Role in the January 6, 2021 Attack on the Capitol**

*Approach to the Capitol*

On January 5, 2021, Todd traveled to Washington, D.C. from his home in Missouri to attend former President Trump's "Stop the Steal" rally. Todd knew the Electoral College certification proceeding was taking place at the Capitol on January 6, 2021. Gov. Ex. 600A at 11. Todd attended the rally and stipulated at trial that he watched former President Trump's entire speech. That speech included discussion of the Vice President's presence at the Capitol and Todd acknowledged that he heard former President Trump say that Vice President Mike Pence was going to be at the Capitol. Todd also admitted he heard former President Trump's claims that the election of President-elect Joe Biden was a fraud, and that the election was stolen.

After former President Trump's speech, Todd went to the U.S. Capitol, where he knew the certification was taking place. He testified to the grand jury that he went to voice his opinion about the election and to show "support" for the "best outcome." *Id.* at 9. Todd stated he went to the Capitol to voice his concerns with the authenticity of the 2020 elections.

```
 9        Q.    Okay.  And, in your opinion, it -- withdrawn.  You
10    testified that the -- there was some questionable, or some
11    concerns, about the authenticity of the election process; is
12    that correct?
13        A.    Yes, ma'am.
14        Q.    And you were headed to the Capitol that day to
15    voice your concerns with that process; is that correct?
16        A.    After the speech.  Then they said let's go down
17    there, yes.
```

*Excerpt from Gov. Ex. 600A at 13: Portion of John George Todd III Grand Jury Testimony*

He walked from the Ellipse to the U.S. Capitol, carrying a makeshift flagpole made from a tent pole, with a flag tied to the end. By approximately 2:15 p.m., Todd had moved through the dense crowd on the West Plaza and arrived near the media tower. At that time, the barricades were still in place and the police line was still intact. Open-source video shows Todd then walked through the crowd on the west front towards the Inaugural Scaffolding.



*Image 1: Still from Gov. Ex. 301. Todd, circled in red, walked through crowd on the west front of the U.S. Capitol.*

At approximately 2:40 p.m., Todd climbed the stairs under the northwest scaffolding and onto the Inaugural Stage. He then climbed up the temporary bleachers, which had been erected for the upcoming Presidential Inauguration, and approached the Upper West Terrace of the Capitol.



*Images 2-3: Stills from Gov. Ex. 302. Todd, circled in red, climbed the Inaugural Scaffolding.*

As he stood outside the Upper West Terrace doorway, crowds of uniformed police in riot gear firing tear gas at the crowd were clearly visible from his vantage point and a loud alarm blared overhead. This clearly indicated that the crowd was not allowed in this area. Todd ignored those warning signs and entered the U.S. Capitol building via the Upper West Terrace Door at 2:44 p.m.



*Image 4: Still from Gov. Ex. 202. Todd, circled in red, entered the U.S. Capitol through the Upper West Terrace Door.*

### *Inside the Capitol*

One minute after entering the Capitol, Todd walked into the Capitol Rotunda via its west door. After briefly leaving the Rotunda, Todd reentered the Rotunda through the north door at 2:52 p.m. Todd exited and entered the Rotunda once more, at which time he encountered law enforcement officers attempting to clear the Rotunda of rioters. Between approximately 3:00 p.m. and 3:10 p.m., Todd was repeatedly told to leave by police officers. Todd refused to leave and kept returning to the front of the crowd to resist the officers and ignore their commands.  In BWC from MPD, Todd was recorded screaming at multiple law enforcement officers. For example, Government's Exhibit 400 showed Todd yelling at MPD Officer Travis Coley, "I swear to God, I'll hip toss your ass into the fuckin' crowd, mother fucker!" while Officer Coley stood in a doorway trying to contain rioters. Government's Exhibit 400 further captured Todd yelling, "We've exhausted every fucking legal route!" as he continued to obstruct the Rotunda.



*Image 5: Still from Gov. Ex. 400. Todd shouting at MPD Officer Travis Coley in the Rotunda*

At approximately 3:10 p.m., police officers formed a line in the Rotunda and attempted to move the rioters to the exit. As they moved forward, the officers gave commands to the crowd to "move back!" and "get back!" Todd clearly heard these commands, yet chose to ignore them, as he continued to press against the police line and yelled, "I ain't fuckin' moving!" Gov. Ex. 401.

### Assault of MPD Officer Noah Rathbun

MPD Officer Noah Rathbun was one of the officers attempting to clear the Rotunda. Despite having already sustained injuries from an assault that occurred on the exterior of the building when a rioter struck him several times with an aluminum flagpole, Rathbun nevertheless responded to help law enforcement clear the Rotunda. Todd remained at the front of the police line despite having multiple opportunities to move back. He continued to shout, antagonize, and threaten officers. Rathbun thought Todd was about to strike law enforcement officers with his fiberglass tent pole and attempted to take the pole from Todd.

Todd and Officer Rathbun each held on to the fiberglass pole and as they both tried to pull away from the other person, the pole splintered, creating sharp fiberglass shards. Todd saw the splintered fiberglass before pulling or "jerking" the splintered pole out of Officer Rathbun's hands, slicing the officer's finger open at the knuckle. 1/31/2024 Trial Tr. at 39. The cut was deep and exposed a tendon. As captured by CCTV, the injury forced Officer Rathbun to immediately retreat from the Rotunda and to leave the Capitol to receive medical attention. As Officer Rathbun testified, he received seven stitches and missed 9 days of work (costing MPD approximately $4,514.68). The jury ultimately determined that Todd had forcibly assaulted, resisted, or impeded Officer Rathbun in a way that caused bodily injury to him.



*Image 6: Todd held his makeshift flagpole while police officers gave orders to move/leave: "Get Back!" "Let's Go"*



*Image 7: Todd yelled: "I'm not fucking moving, get your hands off me, get your fucking hands off me - I'm not fucking touching nobody." Officer Rathbun reached out to grab the makeshift flagpole.*



*Image 8: Several officers attempted to contain Todd. Officer Rathbun continued to hold on to the flagpole out of concern Todd would wield it as a weapon.*



*Image 9: Todd (circled in red) and Officer Rathbun each holding on to one end of the flagpole and pulling for control.*



*Image 10: Todd and Officer Rathbun pulled on the fiberglass pole and the pole splintered, creating sharp fiberglass shards. Todd saw the splintered fiberglass and "jerked" the splintered pole out of Officer Rathbun's hands, slicing the officer's finger open at the knuckle.*



*Image 11: Officer Rathburn's hand bled after being cut. While Todd continued to scream at officers, Officer Rathbun saw his bleeding hand and sought medical attention.*

### *After the Assault of MPD Officer Noah Rathbun*

Police were finally able to force Todd to leave the Rotunda and Capitol building through the east doors at 3:18 p.m. He then proceeded to move towards the Northwest Terrace of the Capitol. Over the next hour, Todd interacted with both the crowd and police. In one open-source video, Todd told other rioters, "We were inside yelling we need more people until they pushed us out." Gov. Ex. 309. At least once, Todd again used force against the police, shoving his body against the police shields of Montgomery County Police officers as they attempted to clear the Northwest Stairs at 4:42 p.m. BWC footage captured Todd banging against officer shields, yelling encouragement to the crowd, and repeatedly challenging officers, "Come on, drop your shit! Let's go right now." Gov. Ex. 404 & 405.



*Image 11: Todd, in red, shoved police shields and screamed at officers on the Northwest Stairs.*

As seen on BWC, Todd accused the officers of being pedophiles and yelled to the crowds farther down on the west side to come up because, "[the rioters at the front] need more people!" in an apparent attempt to renew the physical assault against law enforcement and the Capitol itself. *See* Gov. Ex. 405.

By 4:50 p.m., Todd had made his way to just outside the Lower West Tunnel, where police had engaged in an hours-long physical conflict with the crowd. It was the site of some of the worst violence of the entire Capitol Siege. Todd leaned off railings and watched rioters attacking officers with plywood and bear spray, as other rioters on megaphones called for the crowd to pass up their gas masks and helmets so that the people at the front could continue their siege on the officers in the tunnel. *See* Gov. Ex. 310.



*Image 12: Still from Gov. Ex. 310. Todd, circled in red, at the Lower West Tunnel. He watched rioters hurling implements and aiming bear spray at officers in the tunnel.*

Todd eventually exited the Capitol grounds, walked west towards the National Mall, and gave a video interview about his conduct that day.



*Image 12; Still from Gov. Ex. 311: Todd spoke to a journalist on the National Mall. When asked what the people should do, Todd responded, "The people should stand up and fight."*

### III.   THE CHARGES, SUPERSEDING INDICTMENTS, AND TRIAL

The initial complaint in this case was filed on May 3, 2022, charging Todd with four misdemeanors. His case proceeded before Magistrate Judge Upadhyaya and was eventually set for trial on December 15, 2023.  In the preparation for trial, the government discovered the footage of Todd assaulting Officer Rathbun. On December 6, 2023, a federal grand jury returned an indictment charging Todd with five counts, including of 18 U.S.C. §§ 111(a)(1) and (b) (Inflicting Bodily Injury on Certain Officers), 18 U.S.C. §§ 1752(a)(1) (Entering and Remaining in a Restricted  Building or Grounds) 18 U.S.C. 1752(a)(2), (Disorderly and Disruptive Conduct in a

Restricted Building or Grounds), 40 U.S.C. §§ 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building), 40 U.S.C. 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building).

Based on his testimony in Grand Jury, on January 17, 2024, the government sought a superseding indictment to further charge Todd with a violation of 18 U.S.C. §§ 1512(c)(2), (Obstruction of an Official Proceeding). The grand jury returned a second superseding indictment adding the additional charge.

On February 7, 2024, the jury found Todd guilty on all six charges following a five-day trial.

## IV.    STATUTORY PENALTIES

Todd now faces sentencing on the above six counts.

| Count | Statute | Maximum Term of Imprisonment | Maximum Supervision | Maximum Fine |
|-------|---------|------------------------------|---------------------|--------------|
| 1 | 18 U.S.C. § 1512(c)(2) | 20 years | 3 years | $250,000 |
| 2 | 18 U.S.C. § 111(a)(1) and (b) | 20 years | 3 years | $250,000 |
| 3 | 18 U.S.C. § 1752(a)(1) and (b)(1)(A) | 10 years | 3 years | $250,000 |
| 4 | 18 U.S.C. § 1752(a)(2) and (b)(1)(A) | 10 years | 3 years | $250,000 |
| 5 | 40 U.S.C. § 5104(e)(2)(D) | 6 months | 5 years | $5,000 |
| 6 | 40 U.S.C. § 5104(e)(2)(G) | 6 months | 5 years | $5,000 |

Todd faces a Sentencing Guidelines range of 151-188 months of imprisonment, a term of supervised release of not more than three years, $3,759.68 in restitution, and a mandatory special assessment of $270.  ECF No. 217.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government's Sentencing Guidelines analysis largely tracks the PSR, with the exception of the offense calculation for Count II.  Based on the testimony and exhibits presented at trial, the government asks the Court to apply a +5 level enhancement for Serious Bodily Injury inflicted on Officer Rathbun pursuant to U.S.S.G. § 2A2.2(b)(3)(A). This enhancement would result in a total offense level of 33 and a Sentencing Guidelines Range of 151-188 months.

The government's analysis is as follows:

Count One: 18 U.S.C. § 1512(c)(2)

|  |  |  |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
|  | **Total** | 16[4] |

---

[4] Following the D.C. Circuit's March 1, 2024 opinion in *United States v. Brock*, No. 23-3045, the sentencing enhancements at U.S.S.G. § 2J1.2(b)(1)(b) and (b)(2) do not apply to convictions under 18 U.S.C. § 1512(c)(2) for conduct disrupting Congress's counting and certification of the

Count Two: 18 U.S.C. § 111(a)(1) & (b)

| U.S.S.G. § 2A2.2 | Cross-Referenced Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(3)(A) | Serious Bodily Injury | +5 |
| U.S.S.G. § 2A2.2(b)(7) | Convicted under 18 U.S.C. § 111(b) | +2 |
| U.S.S.G. § 3A1.2(a), (b) | Victim was a government officer | +6 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **33** |

Count Three: 18 U.S.C. § 1752(a)(1)

| U.S.S.G. § 2B2.3(a) | Base Offense Level | 4 |
|---|---|---|
| U.S.S.G. § 2B2.3(b) | Restricted Building or Grounds | +2 |

Todd entered the restricted area for the purpose of obstructing the official proceeding, so application of the cross-reference to Count One is appropriate for Count Three.

| U.S.S.G. §2X1.1(a) | Cross Referenced Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **16** |

Count Four: 18 U.S.C. § 1752(a)(2)

| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
|---|---|---|
| U.S.S.G. § 2A2.4(b)(1)(A) | Physical Contact | +3 |
| U.S.S.G. § 2A2.4(b)(2) | Bodily Injury | +2 |
| | | |
| U.S.S.G. § 2A2.2 | Cross Referenced Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(3) | Serious Bodily Injury | +5 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **25** |

---

electoral college votes on January 6, 2021.  Departures, such as those under U.S.S.G. §5K2, or variances may nonetheless be appropriate.

<u>Count Five: 40 U.S.C. § 5104(e)(2)(D)</u>

Because this offense is a Class B misdemeanor, the Guidelines do not apply. *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

<u>Count Six: 40 U.S.C. § 5104(e)(2)(G)</u>

Because this offense is a Class B misdemeanor, the Guidelines do not apply. *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

<u>U.S.S.G. § 3D1.2 Grouping</u>

The offenses charged in Counts One, Three, and Four constitute a single group (Group One) because the victim of those charges is the same – namely, the United States Congress. See U.S.S.G. § 3D1.2(a) and (b). Count Two charges the defendant with assaulting, resisting, and opposing Officer Rathbun, a separate victim (Group 2). Groups One and Two will group under U.S.S.G. 3D1.2(c) because Count Two embodies conduct (dangerous weapon and serious bodily injury) that serves as specific offense characteristics 12 to counts in Group One. Therefore, all four counts group and the combined offense level is 33. See U.S.S.G. § 3D1.3(a).

<u>Analysis of Count II – Serious Bodily Injury</u>

The difference of two points between the government's calculation and the PSR's calculation is whether or not the U.S.S.G. § 2A2.2(b)(3)(A) +5 enhancement for Serious Bodily Injury applies. The PSR only applied the +3 for Bodily Injury, reducing its overall calculation by two offense levels. PSR ¶ 70. However, based on the testimony and exhibits introduced at trial, serious bodily injury guideline is more appropriate. As defined under U.S.S.G. § 1B1.1 n. 1(M), serious bodily injury means "injury involving extreme physical pain or the protracted impairment

of a function of a bodily member, organ, or mental faculty; or *requiring medical intervention such as surgery, hospitalization, or physical rehabilitation*." (emphasis added).

As Officer Rathbun testified at trial, he had been deployed to the Capitol on January 6, 2021 to quell the riot.  Prior to entering the Rotunda, Officer Rathbun had been attacked by crowds and even hit in the head.  Yet those injuries did not rise to the level that John Todd inflicted on him. Despite suffering violence as he worked on the Capitol Grounds, Officer Rathbun then entered the Rotunda with his team to attempt to expel the rioters from inside.  It was not until then that Todd sliced Rathbun's hand open with a weaponized flagpole.  As demonstrated by the photos and videos, Rathbun's hand almost immediately started bleeding and Rathbun disengaged from the crowd and sought medical attention.  He was hospitalized and he received stitches.  The fact that Officer Rathbun had to be hospitalized based on this injury is especially serious in the January 6 context as law enforcement was overrun by rioters and Officer Rathbun's presence at the Capitol was greatly needed that day.  The Court should apply the +5 enhancement as this injury clearly fits within the definition of Serious Bodily Injury.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.  However, Section 4C1.1 does not apply in this case, because (1) Todd is a Category II offender and (2) Todd was convicted under 18 U.S.C. § 111(a)(1) & (b) for causing serious bodily injury to MPD Officer Noah Rathbun. *See* U.S.S.G. § 4C1.1(a)(3) (providing that the adjustment for zero-point offenders only applies if "the defendant did not use violence or credible threats of violence in connection with the offense").

The PSR calculated the Todd's criminal history as Category II, which is not disputed. Accordingly, the government calculates a combined adjusted offense level of 33, resulting in a Guidelines ranges of 155-188 months.

## VI.      SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

Sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Todd's felonious conduct on January 6, 2021 was part of a massive riot that nearly succeeded in preventing the certification vote from being carried out, frustrated the peaceful transition of Presidential power, and threw the United States into a Constitutional crisis. Todd came to Washington, D.C. and illegally entered the Capitol building with the intent of stopping the 2020 Certification of the Presidential election. Once inside he clashed with law enforcement, screamed profanities, resisted the efforts of law enforcement to clear the building, and eventually assaulted and caused bodily injury to an MPD officer. He then remained on Capitol grounds for nearly two hours and continued to shout at police and agitate the crowd. The nature and circumstances of Todd's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 151 months, which is at the low end of his calculated guidelines range.

### B.  The History and Characteristics of the Defendant

The defendant's crimes on January 6 were not an isolated event in an otherwise law-abiding life. He has had the following adult criminal convictions:

21

| Date | Conviction | Court | Sentence |
|------|-----------|-------|----------|
| 04/09/2009 | Expired Metrolink Ticket (No Valid Fare) | St. Clair County Circuit Court, Belleville, IL | $70 fine |
| 06/09/2012 | Driving Under the Influence - Alcohol - 1st Offense | 16th Judicial Circuit Court, Jackson Co., MO | 30 days incarceration, all but 2 days suspended (time served); $585 fine/costs or 59 hours community service; DUI School and Victim Impact Panel or outpatient counseling |
| 04/19/2014 | A. DWI - Alcohol (131833099)<br><br>B. Possession of Drug Paraphernalia (130729316)<br><br>C. Possess Marijuana (130729317) Exceeded Posted Speed Limit (11-15 MPH Over) (131833096) | 03/04/2015:<br>• (131833099, 130729316, 103729317) - Suspend imposition of sentence (SIS); 24 months' probation, each count<br>• (131833096): 1 day jail<br><br>08/25/2016:<br>• 131833099, 130729316, 103729317 - Probation revoked, 20 days incarceration, to run concurrently | 3 years |

Todd is also a U.S. Army veteran who was given an "other than honorable" discharge, the

most severe nonpunitive/administrative discharge in the U.S. military that is typically reserved for

service members who have committed serious misconduct. 2/2/2024 Trial Tr. at 103-104. Todd's

other than honorable discharge was the result of alcohol abuse and incidents resulting from serious

alcohol abuse.

This Court has previously credited military service as a mitigating factor, given the defendant's commitment to serve his nation. The government agrees that military service is an honorable characteristic in the context of sentencing. But it also can be a double-edged sword, as the defendant, in this case, used force against law enforcement protecting the legislature of the United States. Moreover, while his other than honorable discharge appears to be related to substance abuse, it is unfortunate that his failure to address such abuse could have contributed to the circumstances that led to his involvement in a riot.

Most notably, there have also been numerous serious interactions between Todd and law enforcement during the duration of this criminal case. Todd violated his pretrial supervision conditions twice. On September 9, 2022, Todd's ex-wife contacted Blue Springs Police Department advising the defendant was suicidal and armed with a gun. On April 24, 2023, Todd was identified climbing up the side of a building with razor blades and knives on his person, attempting to enter the home of the man who was romantically involved with Todd's ex-wife. The officers at the scene found Todd intoxicated and found three 3-inch horizontal cuts on his Todd's inner forearm. Todd told police officers that he had been trying to kill himself and he was transported from the scene for a 96-hour mental health evaluation. There were police reports made for both incidents and the reports are attached as supplements to ECF No. 48. The Magistrate Court found this episode concerning enough that it placed Todd into a high intensity supervision program and required him to move to a different state to be put in the care of his sister. *See 5/2/2023 Minute Order and ECF No. 52.*

Todd also consistently demonstrated a lack of honesty at trial when he repeatedly lied during his testimony.  For example, he stated that the officer at the door to the Capitol told him he could enter and watch the proceedings if he did not interrupt or disrupt them. He claimed he did not encounter any barriers, signs, or other indications that he was not allowed on Capitol grounds or in the building. He also testified a police officer told him, "You can come in and watch the proceedings, just don't disrupt them." Trial Tr. 2/2/2024 at 127. This testimony was contradicted by the testimony of USCP Lieutenant Millard who stated that neither he nor any other officer at that door ever told any rioter that they could come in and watch the proceedings. The testimony was also directly contradicted by both CCTV and open-source video of Todd entering the building. This also contradicted what he told the grand jury, specifically that he spoke to officers outside the building. No police officer is visible near Todd when entered the building and before he went to the Rotunda, meaning that he could not have received permission from an officer to go inside the building.

And finally, while Todd admitted to parading in the Capitol, he denied that he was aggressive with police, instead claiming that he was merely holding on to his flagpole in the Rotunda. The jury clearly did not credit this testimony, and his statements are directly contradicted by the testimony of MPD Sergeant Noah Rathbun, MPD Officer Travis Coley, and MPD Sergeant Jake Coletti. *See* Gov. Ex. 400-402.

## C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

Todd's criminal conduct on January 6 was the epitome of disrespect for the law. Todd's behavior since January 6, including his numerous violations of pretrial conditions, demonstrate

that he does not hold respect for the law. Todd stormed the United States Capitol building on January 6 knowing full well that what he was doing was illegal.  As he moved through the building and refused to clear the Rotunda, Todd screamed at law enforcement, "We've exhausted every fuckin' legal route!" Gov't Ex. 400. Having exhausted "legal routes," Todd dedicated himself to unlawful means to achieve his desired political goals.  After his arrest, Todd repeatedly violated his pretrial conditions and posed a safety threat to his ex-wife and her partner.

As the country approaches anther contentious election year, one that will see a rematch of the 2020 Presidential election that was at issue for the rioters on January 6, every January 6 sentencing sends a message about the importance of democratic values and the rule of law. As Judge Lamberth recently wrote in another sentencing, "those who think political ends justify violent means seek to replace persuasion with intimidation, the rule of law with 'might makes right.'…In that sense, political violence rots republics. Therefore, January 6 must not become precedent for further violence against political opponents or governmental institutions. This is not normal. This cannot be normal." *U.S. v. Johnakakis*, 1:21-cr-91-RCL-3, ECF No. 272 at 5.

Todd's demonstrated a clear lack of respect for the law. Not only does his behavior on January 6 demonstrate a refusal to accept the general rule of law – but his particular behavior, including going into areas that were clearly off limits, refusing to leave, attempting to instigate other rioters – all demonstrate a disrespect for the democratic process and for the rules of common decent behavior.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to Todd weighs in favor of a heavy sentence. First, Todd has a criminal history and he has shown a clear pattern of aggressive and dangerous behavior. *See* Section VI(B) *supra.*

Second, Todd has never expressed remorse and contrition for his actions on January 6, 2021. Instead, he has remained adamant that a law enforcement officer allowed him to come into the Capitol (a claim demonstrably proven to be false) and denied any responsibility for Officer Rathbun's injury. (Trial Tr. 02/02/2024 at 198-199). Todd repeatedly provided materially false testimony at trial. For the entirety of the trial, Todd held himself out to be a victim of circumstance and not a participant in a riot. Materially false testimony is not only harmful in the context of the guidelines (*see supra*) but showcases a need to deter this defendant and other defendants from engaging in similar misconduct. The reality is that the criminal justice system only works when all parties seek to obtain justice based on facts and truth. Lying to save oneself under oath is often

---

[5] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

as corrosive to the overall system than the actual crime itself.

Finally, Todd's own statements in the Rotunda, that he and the other rioters had "exhausted every fuckin' legal route," demonstrate that his sentence must be sufficient to provide specific deterrence from committing future crimes of violence. Todd was aware that he was inside the U.S. Capitol building. He admitted to the grand jury that he heard President Trump discuss Vice President Mike Pence's presence at the Capitol and that he knew the election was being certified. Todd's had full knowledge of his actions and their effect on the election certification. His repeated denials of responsibility came against a backdrop of evidence showing that he understood his actions were illegal. The totality of his conduct demands the court weigh the need for specific deterrence heavily in determining his sentence.

### E.    The Importance of the Guidelines

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section

3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In *United States v. Craig Bingert and Isaac Sturgeon*, 21-CR-91 (RCL), following a bench trial, Craig Bingert and Isaac Sturgeon were found guilty on seven counts, including 18 U.S.C. §§ 1512(c)(2) and 111(a)(1). They were subsequently sentenced to 96 months of incarceration and 72 months of incarceration, respectively. On January 6, 2021, like Todd, Bingert and Sturgeon joined the mob on the west front of Capitol grounds. While they were near the front of the mob at the base of the inaugural stage, the mob reached its full strength and violently broke through the officer line, forcing officers to retreat. Bingert and Sturgeon followed officers retreating up the southwest stairs and, when they reached the top of the staircase, confronted a newly formed line of officers standing behind a row of bike racks. Unlike Todd, who had his physical confrontation with law enforcement in the Rotunda, Bingert and Sturgeon faced off with officers on the west front of the Capitol. After their co-defendant Taylor Johnatakis counted down, Bingert and Sturgeon forcibly grabbed a bike rack and thrust it against the police line, resulting in injury to at least one officer. The critical similarity in these cases was a physical confrontation with a police officer engaging in riot control. Additionally, like Todd, Bingert testified untruthfully at trial.

Both Bingert and Sturgeon each had a combined offense level of 33 and the government sought sentences of 135 months for both defendants. Bingert was eventually sentenced to 96 months and Sturgeon was sentenced to 72 months. However, Todd's case is more egregious than Bingert and Sturgeon's because of the guilty verdict on the 18 U.S.C. § 111(b) charge. Sturgeon and Bingert were only found guilty of the lesser 18 U.S.C. § 111(a) charge (which the jury also convicted Todd on). This disparity in charges, convictions, and sentencing recommendation, is thus warranted and proper.

In *United States v. Matthew Krol,* 1:22-cr-00110 (RC), Krol was convicted of violating 18 U.S.C. §§ 111(a) and (b). On January 6, 2021, Krol confronted and screamed at police officers on the west front. Krol then wrestled with a police officer for control of a police baton, and then used same police baton to violently strike at police officers, badly injuring the right hand of a U.S. Capitol Police Sergeant. Krol was sentenced to 51 months of incarceration. Like Todd, Krol engaged in violent conduct at the Capitol and injured an officer's hand. The critical difference from *Krol* is that Krol pleaded guilty to 18 U.S.C. § 111(b) and received acceptance points, resulting in Krol having an adjusted offense level of 26. Unlike Krol, Todd did not accept responsibility, did not receive acceptance points, and continues to express no remorse. The government urges the court to look at the seriousness of the underlying conduct from *Krol,* while recognizing that Todd's offense level of 33 means that a longer sentence is appropriate.

In *United States v. Thomas Webster*, 1:21-cr-208 (APM), Webster was a retired New York Police Department officer was sentenced to 120 months in prison after being found guilty of violating 18 U.S.C. § 111(a)(1) and (b), 18 U.S.C. § 231(a)(3), 18 U.S.C. 1752(a)(1) and (b)(1)(a), 18 U.S.C. § 1752(a)(2) and (b)(1)(a), 18 U.S.C. 1752(a)(4) and (b)(1)(a), and 40 U.S.C. 5104(e)(2)(F). Of note, Webster was the other rioter who assaulted Sargent Rathbun. On the Lower West Plaza, Webster approached an MPD officer and began swearing at him, telling him, among other things to "take your shit off," an apparent invitation to the officer to take off his badge and fight. Webster shoved a metal shoved the metal gate into the officer's body. He raised the flagpole and forcefully swung it toward the officer before tackling the officer. Webster was a former police officer and Todd was a former military serviceman. But Todd's case is more serious for several

reasons. First, Todd's assault of Webster required stitches. Second, Todd lied to *both* the grand jury and the jury, while Webster only lied once. And finally, Todd had multiple pretrial release violations. The totality of these circumstances requires a serious period of incarceration.

## VII.   RESTITUTION

The Court should order Todd to pay $2,000 in restitution to the Architect of the Capitol and find Todd solely liable for $2,514.68 to MPD, based on the costs of Officer Rathbun's medical treatment and his time off work due to his injuries that MPD incurred on his behalf. Evidence of these bills are attached as Exhibit 2. The court should note that for the medical bills, the entire cost of the "repair superficial wound" line-item is included in the government's calculation. As Officer Rathbun was also injured in another assault that day, the government is only seeking half of the "Office/Outpatient Visit" line-item entry from Exhibit 2.[7]

### A.   The Court Should Order Todd to Pay Restitution to the Architect of the Capitol

The Court should order Todd to pay $2,000 to the Architect of the Capitol.   The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).  Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C.

---

[7] The Government respectfully requests that Exhibit 1 and Exhibit 2 be filed under seal. A copy of the exhibits will be emailed to chambers and defense counsel.

§ 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Under 18 U.S.C. § 3663(a)(3), Todd should pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role he played in the riot on January 6.  The riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies in July 2023. *Id.* This restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.  *See* PSR ¶ 39.

### B.    The Court Should Order Todd to Pay Restitution to MPD

In addition, under 18 U.S.C. §§ 3663(b)(2) and 3663A(b)(2), Todd should also be ordered to pay restitution to "all victims who suffered bodily injury as a result of [his] conduct," including Officer Rathbun, in an amount to be determined by the Court.  As reflected in Exhibits 1 and 2, the MPD incurred a total of $4,514.68 on Officer Rathbun's behalf that is attributable, at least in part, to Todd's criminal conduct and his offense of conviction—pulling a splintered flagpole from Officer Rathbun's hand, slicing the officer's hand open at the knuckle. The cut was deep and exposed a tendon in his finger, requiring medical attention and stitches. Officer Rathbun missed nine days of work, costing MPD $4,514.68 in missed service. Todd, who was responsible for the injury to Officer Rathbun, should be held responsible for the damages caused.

**C.    The Court May Impose a Statuary Fine, But Here Should Refrain From Doing So**

The defendant's convictions for violations of 18 U.S.C. § 111 (b) and 18 U.S.C. § 1512(a)(2) and subject him to a statutory maximum fine of $250,000 *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

## CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 151 months incarceration, 3 years supervised release, $4,514.68 in restitution, and a mandatory assessment of $270.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:                              /s/ *Matthew Beckwith*
                                 MATTHEW BECKWITH
                                 DC Bar No: 90014452
                                 Assistant United States Attorney
                                 601 D Street, N.W.
                                 Washington, D.C. 20004
                                 Matthew.beckwith@usdoj.gov

                                 /s/ *Barry K. Disney*
                                 Barry K. Disney

33

KS Bar No. 13284
Assistant United States Attorney – Detailee
U.S. Attorney's Office for the District of
Columbia
601 D Street, N.W.
Washington, D.C. 20530
Email:  Barry.Disney@usdoj.gov
Cell:  (202) 924-4861

/s/ *Allison K. Ethen*
Allison K. Ethen
MN Bar No. 0395353
Assistant United States Attorney – Detailee
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Email: Allison.Ethen@usdoj.gov

/s/ *Kaitlin Klamann*
KAITLIN KLAMANN
Assistant United States Attorneys
601 D Street, N.W.
Washington, D.C. 20530