**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

*Plaintiff*

**UNITED STATES OF AMERICA**


**v.**                                    **Case No. 22-CR-00166-BAH**


**JOHN GEORGE TODD,**

             *Defendant.*



**DEFENDANT TODD'S SENTENCING MEMORANDUM**

Defendant John George Todd ("Defendant"), by undersigned counsel, hereby submits to this Court his Sentencing Memorandum. Defendant respectfully requests a sentence of two (2) years' probation—with weekly counseling classes, no fine, and no restitution. Defendant has no prior violent offenses within the last ten years—this is his first felony offense. Throughout his life, Defendant has endured extensive trauma. Defendant is an honorable veteran that served in the United States Marine Corps for a term.[1] Since serving the United States, Defendant has battled with PTSD, military related sexual trauma, anxiety, and depression.[2] Moreover, incarceration will only further Defendant's trauma whereas rehabilitation and therapy will mend Defendant's devastating past.

**INTRODUCTION AND OVERVIEW**

---

[1] Defendant served in the United States Marine Corps from 2009 to 2013—4 year term.
[2] Defendant's diagnosis referred to herein are provided in this Sentencing Memorandum.

Like so many January 6 cases, this case began with Defendant facing mere misdemeanors. During that time, Defendant was offered plea deals—in exchange for the government dropping all but minor charges, Defendant would plead guilty to  petty misdemeanors. However, Defendant insisted on pursuing his constitutional rights and rejected such plea deals. During that same time— intermixed with the aforementioned pretrial, misdemeanor proceedings—Defendant's personal life was in turmoil. Specifically, Defendant's wife not only committed adulterous acts against him, but further abandoned him and the marriage. Unfortunately, Defendant also lost contact with his only son. The aforesaid events lead Defendant to descend into depression and other mental health crises, further resulting in Defendant's repeated attempt at suicide.

Notwithstanding Defendant's past, rather than revoke Defendant's pretrial release, Magistrate Judge Upidayha subjected Defendant to numerous restrictions, reporting requirements and orders to relocate.  Defendant was forced to  relocate from Missouri to South Carolina to be within the care of his sister and her family.

Following his move and prior to his misdemeanor trials, the Department of  Justice ("government") claimed to have uncovered video footage of Defendant causing "bodily injury" to a police officer.  Specifically, the government claimed that police officer Rathbun cut his finger on a fiberglass flagpole while trying to wrest it from Todd's hands. However, that fiberglass flagpole was held firmly between Rathbun's own hands. Even in light of that same fact and the impending trial—which was to occur the next day—the government erroneously added a superseding 20-year-felony claim against Defendant resulting in  an abrupt change to the trial schedule.  Just days before the newly scheduled trial, Defendant was, again, indicted with another 20-year felony claim—a claim that Todd obstructed an official proceeding in violation of 18 U.S.C. § 1512.

In January of 2024, Defendant—completely unprepared and still suffering from his no less than devastating past—endured a jury trial, with the over looming potential to wrongfully face decades in prison. On February 7, 2024, the jury found Defendant guilty as to each count of the government's Superseding Indictment. Notably, the jury deliberated for several days before coming to the verdict. During that time, a juror observed that fellow jurors brought in and subsequently considering facts outside of the evidence presented at trial.

**On Jan. 6, Todd entered the Capitol through a wide open door.**



*Image 4: Still from Gov. Ex. 202. Todd, circled in red, entered the U.S. Capitol through the Upper West Terrace Door.*

OFFICER RATHBUN'S FINGER CUT

It is noteworthy that the government's sentencing memo in this case purports to perform a new, unsanctioned calculation of Todd's guideline range. 151 months of incarceration, 3 years of supervised release, $4,514.68 in restitution, a mandatory assessment of $270. This recommendation reflects the low end of the "government's calculated Sentencing Guideline range" purports to place Todd in a range of 151 to 188 months' imprisonment. **(**Document # 224).

**Officer Rathbun's finger cut does not qualify as a serious bodily injury under federal law.**

The government claims to have done its own calculation of Todd's guideline range, and adds +5 points because he caused "serious bodily injury" to an officer (a cut on a finger). But the term "serious bodily injury" is defined at USSG § 1B1.1, comment. (n.1B). A "serious bodily injury" warranting a four-level increase is an "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." § 1B1.1, comment. (n.1M).

Plainly, Officer Rathbun's finger cut and seven stitches does not qualify under this definition.



18 USC § 2246(4) similarly defines serious bodily injury as "bodily injury that involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious

disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty."  Again, this definition plainly does not apply to Officer Rathbun's finger cut.

It must be remembered that Officer Rathbun's bodyworn camera showed the officer firmly gripping Todd's flagpole between the Officer's two strong hands.  Officer Rathbun unnecessarily broke Mr. Todd's fiberglass flagpole, causing the minor cut to his own finger.  The jury deliberated for parts of 4 days in this, suggesting there were members of the jury that may have argued that the evidence was insufficient; or barely sufficient, to establish Todd's guilt on Count 2.



A slowed-down clip of the moment of injury can be viewed at this dropbox: https://www.dropbox.com/scl/fi/rnubx42ik94vkhgyxcjpj/Rathbun-Video-1.mp4?rlkey=r5vdoy4oorj57kg32az1zx78r&dl=0 .

THE GOVERNMENT'S EXAGGERATED SENTENCING MATH

The government's sentencing memo calculations stray from those of the probation PSR report in several ways.  For example, the government seeks to turn two misdemeanor counts (Counts 3 and 4) into 10-year felonies upon an imaginary notion that Todd's tiny flag with its

fiberglass flagpole  was a 'dangerous weapon.'  At trial the government put on no evidence whatsoever that the flag was a weapon or that Todd ever used it as a weapon.

**The government's hypothetical table of exaggerated sentence ranges:**

| Count | Statute | Maximum Term of Imprisonment | Maximum Supervision | Maximum Fine |
|---|---|---|---|---|
| 1 | 18 U.S.C. § 1512(c)(2) | 20 years | 3 years | $250,000 |
| 2 | 18 U.S.C. § 111(a)(1) and (b) | 20 years | 3 years | $250,000 |
| 3 | 18 U.S.C. § 1752(a)(1) and (b)(1)(A) | 10 years | 3 years | $250,000 |
| 4 | 18 U.S.C. § 1752(a)(2) and (b)(1)(A) | 10 years | 3 years | $250,000 |
| 5 | 40 U.S.C. § 5104(e)(2)(D) | 6 months | 5 years | $5,000 |
| 6 | 40 U.S.C. § 5104(e)(2)(G) | 6 months | 5 years | $5,000 |

Moreover, the Superseding Indictment against Todd <u>did not charge</u> Todd with Section 1752(b)(1)(A) (the 10-year felonies suggested by the government now).

Todd was charged in Counts 3 and 4 only with misdemeanors: under Sec. 1762(a)

|  |  |  |
|---|---|---|
| v. | : | |
| | : | **VIOLATIONS:** |
| **JOHN GEORGE TODD III** | : | **18 U.S.C. §§ 1512(c)(2), 2** |
| | : | **(Obstruction of an Official Proceeding)** |
| Defendant. | : | **18 U.S.C. §§ 111(a)(1) and (b)** |
| | : | **(Inflicting Bodily Injury on Certain** |
| | : | **Officers)** |
| | : | **18 U.S.C. § 1752(a)(1)** |
| | : | **(Entering and Remaining in a Restricted** |
| | : | **Building or Grounds)** |
| | : | **18 U.S.C. § 1752(a)(2)** |
| | : | **(Disorderly and Disruptive Conduct in a** |
| | : | **Restricted Building or Grounds)** |
| | : | **40 U.S.C. § 5104(e)(2)(D)** |
| | : | **(Disorderly Conduct in** |
| | : | **a Capitol Building)** |
| | : | **40 U.S.C. § 5104(e)(2)(G)** |
| | : | **(Parading, Demonstrating, or Picketing in** |
| | : | **a Capitol Building)** |

Additionally, the government proposes to falsely add an additional 5 points to Count 2 for "serious bodily injury" plus an additional 4 points for "dangerous weapon." Under no plausible construction of federal sentencing guidelines could Todd fall under the inflated ranges suggested by the government.

## TODD'S SERIOUS MENTAL HEALTH CHALLENGES CRY OUT FOR DOWNWARD DEPARTURE.

Mr. Todd's mental health and PTSD challenges cry out for treatment rather than incarceration. Todd has been diagnosed with major depressive disorder, recurrent, moderate (ICD-10-CM F33.1) (Primary), as well as post-traumatic stress disorder, chronic (ICD-10-CM F43.12). Todd has a personal history of suicidal behavior (ICD-10-CM Z91.51)

Todd is a 34 year old veteran who came to therapy with concerns related to suicidal ideation, PTSD, previous sucide attempts, depression, and legal concerns. He noted that he tried

to kill himself 2 times this year when his door was kicked in. He stated that his wife left him and took their child with her. He stated that he felt like there "was no light at the end of the tunnel."

He stated that something convinced him not to follow through with it, and he since has moved in with his sister in SC. He noted that he has been doing a lot better, and now struggles only with passive SI. He stated that he has more support than ever, but is struggling as he has to stay on the property due to charges filed against him. He is currently going to trial 12/15/23 for 5 charges related to the Jan. 6 capitol riot. He stated that he currently struggles with PTSD symptoms related to flashbacks, nightmares, hypervigilance, and mood changes. He also noted depression symptoms, such as: low mood, anhedonia, irritability, And difficulty focusing.

On another clinical visit this Veteran is was diagnosed with recurring issues.  Todd remained in a top risk tier or has returned to a top risk tier for suicide and other negative outcomes) at this facility.

The Charles George VAMC REACH VET Coordinator informed the psycologist that John George Todd had been identified as a Veteran who might benefit from enhanced treatment. Todd's counselor conducted a comprehensive chart review to re-evaluate the Veteran's care and have determined that:

> The Veteran is receiving appropriate care and no changes are currently indicated.

> Veteran recently completed CBT-SP and is involved in weekly psychotherapy with Dr. Rothman. Todd has not missed any psychotherapy appointments and has been making good use of treatment.

During their appointment on 11/17/23, the doctor took the following steps:

- Informed JOHN GEORGE TODD III that they have been identified as being at high statistical risk for suicide and other adverse outcomes.
  - Checked in regarding Veteran's current clinical risk:
  - No imminent risk to self or others at this time, stated he has not been having thoughts of suicide.
  - No intent, means, or plan to complete suicide.
  - Stated that he has occasional passive thoughts "I wish I wasn't here", but has been comfortable using safety plan. No firearms. Identified protective factors.
  - Reviewed safety plan and he has a copy.
  - Reviewed and collaboratively discussed access to care. Will continue to monitor risk.
  - Comment: Offered Peer support and SUD services which were declined.
  - He stated he is happy to continue weekly therapy and understands that outreach will be completed.
  - Reviewed and collaboratively discussed care enhancement options and/or treatment plan changes:

  Discussed higher levels of care including inpatient and group options, which were declined at this time.

(ICD-10-CM F33.1)

- Personal Hx of Childhood Physical & Sexual Abuse - Personal history of physical and sexual abuse in childhood (ICD-10-CM Z62.810)
- Personal Hx of Childhood Psychological Abuse - Personal history of psychological abuse in childhood (ICD-10-CM Z62.811)
- Defendant suffered with anxiety and depression while committing each alleged criminal offense. Particularly, Defendant has a long-standing history of mental illness stemming from childhood sexual abuse, marital trauma, and service-related PTSD. Moreover, studies have shown—like in Defendant's case—that individuals who abuse

drugs and alcohol are often unable to appreciate harmful behaviors because even low doses of alcohol impair brain function and judgement.[3] Additionally, the abuse of substances like drugs and alcohol historically cause violent or otherwise aggressive behaviors.[4] Similarly, persons suffering with depression more often than not additionally experience dysfunctions in their social behavior resulting in negative social reactivity—like here.[5] Based on the foregoing Defendant falls within other court's interpretation  and requirements of 5k2.13.

- To date, Defendant has been detained. Further, instead of being afforded, both proper treatment *and* therapy—in compliance with his health plan—Defendant was merely prescribed to take various drug therapies such as Prozac, Buspirone, Melatonin, Trazadone, Ambien, Remeron, and Requip. Studies have shown that co-occurring mental health illnesses and substance use disorders should be treated "at the same time rather than separately."[6] Studies have also shown that exposure to the criminal justice system negatively impacts the health of past drug users.[7] Moreover, there is a well-established link between incarceration and substance use—specifically, there is a

---

[3] Marlene Oscar-Berman, et. Al., *Impairments of Brain and Behavior,* Alcohol Health and Research World, 21(1)(1997). https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6826797/
[4] Tamera Martens, *How Drugs & Alcohol Can Fuel Violent Behaviors*, American Addiction Centers, Feb. 7, 2024, https://americanaddictioncenters.org/rehab-guide/addiction-and-violence
[5] Michael F. Steger and Todd B. Kashdan, *Depression and Everyday Social Activity, Belonging, and Well-being*, Journal of Counseling Psychology 56(2)(2009) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2860146/
[6] *Substance Use and Co-Occurring Mental Disorder*, National Institute of Mental Health, (last visited May 17, 2024) https://www.nimh.nih.gov/health/topics/substance-use-and-mental-health#:~:text=When%20someone%20has%20a%20SUD,care%20provider%20for%20each%20disorder; *see also* Facer-Irwin E, Blackwood NJ, Bird A, Dickson H, McGlade D, Alves-Costa F, MacManus D., *PTSD in prison settings: A systematic review and meta-analysis of comorbid mental disorders and problematic behaviors*, NATIONAL LIBRARY OF MEDICINE, (Sept. 26, 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6762063/; *see also* Olga Cunha et al., *The Impact of imprisonment on individuals' mental health and society reintegration: study protocol*, BMC Psychology 11(215) (2023) https://bmcpsychology.biomedcentral.com/articles/10.1186/s40359-023-01252-w
[6] Govt., Sentencing Memorandum, at 1, ¶ 1.
[7] Hammock, J.A., López-Castro, T. & Fox, A.D., *Prior incarceration, restrictive housing, and posttraumatic stress disorder symptoms in a community sample of persons who use drugs*, HEALTH & JUSTICE 12, 20 (2024). https://doi.org/10.1186/s40352-024-00276-7.

higher likelihood of users returning to substance abuse after release from incarceration leading to overdoses and death.[8]

- 

**TODD'S SENTENCE SHOULD BE CONSISTENT WITH THAT OF OTHER PROTESTORS CONVICTED OF POLITICAL DEMONSTRATION ACTIVITY AT THE CAPITOL OR OTHER FEDERAL BUILDINGS _NATIONWIDE._**

18 U.S.C. § 3553(a)(6) requires that a sentence reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  "On its face, this factor requires a district court to take into account only disparities <u>nationwide</u> among defendants with similar records and Guideline calculations." _United States v. Martinez_, 610 F.3d 1216, 1228 (10th Cir. 2010)  (internal quotation marks omitted) (first emphasis added); _see also United States v. Ivory_, 532 F.3d 1095, 1107 (10th Cir. 2008) (Section "3553(a)(6) . . . looks to uniformity on a <u>national</u> scale."). § 3553(a)(6) requires a district court to consider nationwide disparities does not preclude a district court from remaining cognizant of sentences imposed within the district in cases with similar facts. _See United States v. Gaccione_, 977 F.3d 75, 85 (1st Cir. 2020).

**Sentences for Jan. 6 defendants are the longest in American history for rioting or demonstrating.**

---

[8] Belenko, S., Hiller, M., & Hamilton, L., _Treating Substance Use disorders in the Criminal Justice System_, CURRENT PSYCHIATRY REPORTS, 15(11) (2013). https://doi.org/10.1007/s11920-013-0414-z.

Unfortunately, sentences handed down in the District of DC in 'January 6' cases have created gross sentencing disparities compared to similar defendants elsewhere.  January 6 sentences are the longest prison sentences in American history for rioters or defendants involved in political demonstrations.  January 6 sentences are also grossly out of proportion even when compared to sentences under the same exact statutes, wherever the statutes have been applied elsewhere.

But in the context of § 3553(a)(6), the law requires consideration only of *national* disparities, not *local* ones. *See United States v. Verdin-Garcia*, 516 F.3d 884, 899 (10th Cir. 2008) ("18 U.S.C. § 3553(a)(6) requires a judge to take into account only disparities *nationwide* among defendants with similar records and Guideline calculations." (emphasis in original)); *United States v. Tindall*, 519 F.3d 1057, 1066 (10th Cir. 2008) ("[W]e have held that § 3553(a)(6) requires a judge to take into account only disparities nationwide ...."). Section 3553(a)(6) requires consideration only of nationwide disparities (not disparities with a court's own past sentences).

For example, the George Floyd riots throughout the summer of 2020 caused $2 billion in property damages (while the J6 riot caused only around $1 million). Yet the George Floyd riots resulted in average sentences of a few days in jail.  A June 22, 2020, article from *The Washington Post* tallied over 14,000 arrests made since May 27. *The Hill* reported over 17,000 arrests had been made in the first two

weeks of protests. Valerie Pavilonis, "Fact check: Thousands of Black Lives Matter

protesters were arrested in 2020," USA TODAY Feb. 22, 2022,

https://www.usatoday.com/story/news/factcheck/2022/02/22/fact-check-thousands-

black-lives-matter-protesters-arrested-2020/6816074001/ (accessed 12/24/2023).

Despite the large number of arrests, *The Hill* reported most of those

protesters were booked not for violent crimes, but for low-level offenses such as

violating curfews. Obstructing roadways and carrying open containers were other

reasons for the arrests, as well as "failure to disperse."

Under federal law, criminal sentences should closely match those of

similarly situated individuals in similar situations throughout the United States.

Consider the case of Desmond David-Pitts, who set a police station on fire in

Seattle during 2020 rioting.  David-Pitts was ultimately sentenced to 20 months

incarceration.

https://www.justice.gov/usao-wdwa/pr/alaska-man-sentenced-20-
months-prison-arson-conspiracy-august-2020-fire-seattle-police

**Joined with others burning trash and blocking exits**

**Seattle –**  A 20-year-old Alaska man was sentenced today in U.S.
District Court in Seattle to 20 months in prison for conspiracy to
commit arson in connection with *the fire he set Monday, August 24,
2020, at the Seattle Police Department's East Precinct*, announced
Acting U.S. Attorney Tessa M. Gorman.  Desmond David-Pitts was
arrested shortly after the fire.

David-Pitts is seen on surveillance video *piling up trash against the sally-port door at the Seattle Police East Precinct*.  Over an eleven-minute period, the surveillance video captures David-Pitts not only piling up the trash, but *repeatedly lighting it on fire and feeding the flames with more trash*.  While David-Pitts was lighting the fire, other people who appeared on the surveillance were attempting to use crowbars and cement-like materials to try to disable the door next to the sally-port to prevent officers from exiting the building.  At various times, David-Pitts was *communicating with the black-clad individuals who were attempting to disable the door and light other fires around the building*.  Despite efforts to disable the door, officers were able to get outside and extinguish the flames.  David-Pitts was seen on surveillance working with the others to cut through a chain-link fence that was a barrier around the building.

Generally those who break barriers and destroy property at federal buildings outside Washington, D.C. during political riots face just a few weeks of jail time and meager fines.  Yet J6ers who commit far less serious offenses are raided by FBI SWAT teams and have their lives destroyed.





**Las Vegas protester sentenced for damaging federal building**

The *Las Vegas Review Journal* reports that in Las Vegas during the riots of 2020, pro-government extremist protestors spraypainted graffiti on the federal courthouse and shattered windows with hammers, causing $71,000 in damage. The protestors ultimately received little or no jail time.  One woman was sentenced to three years of probation and six months of house arrest for defacing federal property in 2020 during a Black Lives Matter demonstration. The landscaping around the federal building also was set on fire. Kostan and others repeatedly kicked the windows and doors and broke the windows with hammers, metal bars and the metal letters torn from the federal  building's sign, records show.

The demonstrators were captured on video surveillance and on multiple social media posts. During the event, a federal security officer witnessed the damage and attempted break-in.  Prosecutors said the crowd outside saw him in the lobby and chanted, "Get him! Get the cop!" Kostan received the minimum

sentence the judge could impose. Prosecutors had asked U.S. District Judge

Andrew Gordon to impose a sentence of at least one month in prison and three

years of probation.

JANUARY 6 CASES ARE OUT OF PROPORTION EVEN COMPARED TO OTHER RIOT CASES WITHIN THE DISTRICT OF DC.

Or consider the case of abortion rights demonstrators who destroyed barricades

near the Capitol in 2020.  Most received small fines.



Reuters has recently reported that federal courts have generally sentenced demonstrators who break through barriers or police lines at the Capitol or Supreme Court to small fines and a day or two in jail.  One demonstrator, Jack Murphy, interrupted proceedings with chants and banners in the Senate chamber and **paid a $50 fine and was released a few hours later**.



Demonstrators gather outside the United States Supreme Court as the court rules in the Dobbs v Women's Health Organization abortion case, overturning the landmark Roe v Wade abortion decision in Washington, U.S., June 24, 2022. REUTERS/Michael A. McCoy *Acquire Licensing Rights* ⎘

(Reuters) - A federal judge in Washington, D.C., on Friday sentenced three women to unsupervised probation and barred them from entering the U.S. Supreme Court's grounds during its 2023 term year after they disrupted arguments last fall to protest the high court's ruling overturning the national right to abortion.

U.S. District Judge Amit Mehta sentenced Emily Patterson, Nicole Enfield and Rolande Baker to unsupervised probation until June 30, 2023, after they pleaded guilty to breaking a law against speeches and objectionable language in the court's building.

**| POLITICS**

## Kavanaugh Protesters Ignore Capitol Barricades Ahead of Saturday Vote

**U.S. Capitol Police arrested 101 protesters Friday**



Capitol Police arrest anti-Kavanaugh protesters staging a sit-in on the Capitol steps hours before the vote to confirm Brett Kavanaugh to the Supreme Court on Saturday, Oct. 6, 2018. (Bill Clark/CQ Roll Call)

**By Katherine Tully-McManus**
Posted October 6, 2018 at 1:18pm





Protesters broke through Capitol Police barricades and rushed up the steps to the Capitol Rotunda Saturday afternoon amid large demonstrations ahead of a Senate vote on Supreme Court nominee Brett Kavanaugh.

The metal barricades were erected Thursday to keep demonstrators on specific areas of the Capitol grounds. Security has been heightened on Capitol

| POLITICS

## Kavanaugh Protesters Ignore Capitol Barricades Ahead of Saturday Vote

**U.S. Capitol Police arrested 101 protesters Friday**



Capitol Police arrest anti-Kavanaugh protesters staging a sit-in on the Capitol steps hours before the vote to confirm Brett Kavanaugh to the Supreme Court on Saturday, Oct. 6, 2018. (Bill Clark/CQ Roll Call)

**By Katherine Tully-McManus**
Posted October 6, 2018 at 1:18pm






Protesters broke through Capitol Police barricades and rushed up the steps to the Capitol Rotunda Saturday afternoon amid large demonstrations ahead of a Senate vote on Supreme Court nominee Brett Kavanaugh.

The metal barricades were erected Thursday to keep demonstrators on specific areas of the Capitol grounds. Security has been heightened on Capitol

The Minneapolis/St. Paul, Minnesota riots in 2020

## One year later, few charges for the arson and destruction

BY: **RILYN EISCHENS** - MAY 27, 2021   6:00 AM   



Protestors set fire to the Minneapolis Police Department Third Precinct on May 28. Photo by Max Nesterak/Minnesota Reformer.

More than 1,000 buildings were burned or damaged in Minneapolis in the days after George Floyd's murder. Criminal charges have been filed in connection with 11 of them.

A year after ex-Minneapolis police officer Derek Chauvin killed Floyd, setting off days of peaceful protest and nights of widespread destruction, nearly 100 people have faced felony charges in connection to the unrest. Most charging documents, however, seem to describe opportunistic burglars.

A fraction of the charges describe the defendants breaking into buildings or lighting fires, according to a *Reformer* review of citations and charges from the U.S. Attorney's Office, Hennepin County, Ramsey County, the city of St. Paul and the city of Minneapolis.

Meanwhile, 95% of the 520 misdemeanor citations issued to protesters in Minneapolis have been dismissed.

As the Twin Cities were rocked by looting, vandalism and arson in the last days of May 2020, public officials placed the blame on politically motivated outside agitators. State and local leaders said organized criminals and extremists were traveling to Minnesota, taking advantage of the mass demonstrations and tensions to cause trouble.

So far, only one charging document explicitly links the accused to an extremist group, and none seem to describe especially crafty criminals. Most of the accused are Minnesota residents, with just over half living in Minneapolis or St. Paul.

**Severe sentencing Disparities between "Left Wing" and "Right Wing" Rioters Have Emerged—Which are Anathema to the Rule of Law and the Legitimacy of the Federal Courts.**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." But the Biden DOJ and the U.S. District Court of D.C. have promoted an unfair sentencing landscape in which "conservative," or "anti-government" rioters receive sentences far greater than sentences for "liberal" or "pro-government" rioters.

**The Biden DOJ's break from tradition in pursuit of conservative and "right wing" demonstrators.**

After 240 years, the Biden Administration has broken starkly from America's tradition of political fairness, embarking on prosecutions expressly aimed at the Administration's political foes. While the Government, in its Sentencing Memo, preaches rhetoric about the need to avoid sentencing disparities, it is the government's own sentencing recommendations and prosecutions regarding American political protest which have caused the greatest disparities of all: the gaping disparities between "left wing" and "right wing" protestors and rioters.

Federal sentencing laws and applications which produce unequal treatment of offenders in similar situations but differing politics violates the very essence and foundation of respect for the rule of law.  Indeed, the legitimacy of Congress, the federal courts, and the United States government itself depends on the principle that when Congress enacts laws, such laws must be equally applicable.

Over the past four years, the government has treated pro-government ("left wing") rioters—who generally seek more power for government, more intrusive and expansive bureaucracy, higher taxes, and more government regulations of the environment, speech, public health, and commercial enterprise—with kid gloves;

while sentencing "right wing" rioters—who seek limited government, lower taxes, and less regulation—to the max.

In the case of fellow Jan. 6 defendant Garrett Miller (before Judge Nichols), Miller's able counsel performed an exhaustive review of these disparities between the "right wing" Trump supporters of January 6 and "left wing" rioters in the Portland, Oregon and Seattle areas.

In May and June of 2020, the City of Portland was the scene of several political riots. Much of the rioting took place on a city block in Portland occupied by the Hatfield federal courthouse. The federal government owns that entire Portland City block. Portland protests were followed by nightly criminal activity in the form of vandalism, destruction of property, looting, arson and assault. The Hatfield Courthouse and ICE facility have experienced significant damage to the facade and building fixtures during 2020.

Left wing rioters who actually obstructed and deliberately shut down official proceedings have been prosecuted for misdemeanors by the Biden Justice Department; not felonies.

The same unfairness of outcome is manifested by the treatment of undocumented immigrants at the U.S. southern border.  Recently, migrants

engaged in violent rioting near Eagle Pass, Texas.  The rioters tore down barricades, smashed property, and threatened US border Patrol officers.

But federal prosecutors have declined to prosecute the rioting immigrants for any crime.  See Jim Hoft, "Judge Drops Charges Against Illegals Rioting at Border and Busting Through Fence – If They Were Conservatives They'd Get 10+ Years in Prison," *The Gateway Pundit*, May 10, 2024,

https://www.thegatewaypundit.com/2024/05/judge-drops-charges-against-illegals-rioting-border-busting/ (accessed 5/10/2024).

**To Avoid Severe Sentencing Disparities, the Court should Avoid Sentencing Todd to more than One Year Imprisonment.**

As Garrett Miller's analysis reveals, most of the Portland rioters charged under statutes identical to those faced by January 6 felony defendants ended up with light prison sentences, probation, or having charges dropped.  "Almost Half of Federal Cases Against Portland Rioters Have Been Dismissed," *Wall Street Journal* (April 16, 2021).

Below are some of the summaries of cases dismissed by the U.S. Justice Department involving the Portland riots:

1. **Portland Riot Cases Dismissed to Date**

    ***United States v. Travis Williams*, NO. 20-CR-296 (D. Or.)**

    After taunting law enforcement officials, the Defendant lunged toward the face and neck of a Deputy United States Marshal. When

officers attempted to arrest the Defendant, he ripped the communication devices off two Marshals' vests and partially ripped the ballistic vest off of one of the Marshals. Tasering the Defendant had no affect and he continued fighting the Marshals. He then tried to break a Marshal's arm. Following his arrest, the Defendant told a jailer, "I almost ripped your buddy's arm off, I am a state wrestler."

***United States v. Taylor Charles Lemons*, NO. 20-CR-374 (D. Or.) (**Attachment 4)- Charged a Deputy United States Marshal and struck him with a shield while the Marshal was performing his official duties. When arrested, Defendant was found with a loaded pistol.

**United States v. Thomas Johnson, NO. 20-MJ-00170 (D. Or.) (Attachment 5)-** Assaulted a Deputy United States Marshal in the face with a shield. Defendant was arrested in possession of an asp, OC spray, plated body armor, helmet, gas mask, and goggles.

**United States v. Nicholas Joseph Bantista, NO. 20-CR-431 (D. Or.) (**Attachment 6)- Defendant had a previous conviction for aggravated assault of a police officer in Illinois. During the Portland riots, he struck a federal law enforcement official in the head with a rock. Upon arrest, he was found in possession of a pellet gun and a nail gun power load cartridges.

**United States v. Caleb Willis, NO. 20-CR-296 (D. Or.)** (Attachment 7)- Along with two other individuals, he began punching a Deputy United States Marshal and tried to steal the Marshal's gas mask while the Marshal was performing his official duties.

**United States v. Joshua Webb, NO. 20-MJ-00169 (D. Or.) (**Attachment 8)- Struck a Deputy United States Marshal in the face with a shield and then punched him in the face while the Marshal was performing his official duties. When arrested, the Defendant was found in possession of a tactical vest.

**United States v. David Michael Bouchard, NO. 20-MJ00165 (D. Or.)** (Attachment 9)- Assaulted a federal law enforcement officer using a headlock maneuver while the officer was performing his official duties. When arrested, Defendant was found in possession of a shield and leaf blower.

**United States v. Rebecca Mota Gonzalez, NO. 20-MK00168 (D. Or.) (**Attachment 10 )- Punched a DeputyUnited States Marshal in the face while the Marshal was performing his official duties. When arrested, Defendant was found in possession of a gas mask and goggles.

**United States v. Evan Louis Kriechbaum, NO. 20-MJ00178 (D. Or.) (Attachment 11 )-** Elbowed a uniformed law enforcement officer in the face while the officer was performing his official duties.

**United States v. Giovanni Terrance Bondurant, NO. 20- CR-302 (D. Or.) (**Attachment 12)- Forcibly assaulted a law enforcement officer from behind when the office was in the process of arresting another rioter. When arrested, Defendant was found in possession of a shield and gas mask.

**United States v. Patrick Stafford, NO. 20-CR-295 (D. Or.) (**Attachment 13)- Slammed a DeputyUnited StatesMarshal with a shield allowing another rioter who the Marshal was attempting to arrest to escape.

**United States v. Taimane Jame Teo, NO. 20-CR-205 (D. Or.) (**Attachment 14)- Shined laser into the eyes of a federal law enforcement officer while the officer was performing his official duties. The officer could still see spots 15 minutes after the assault.

**United States v. Gretchen Margaret Blank, NO. 20-CR-224 (D. Or.) (**Attachment 15)- Assaulted a federal law enforcement officer using a shield while the officer was in the process of making an arrest.

**United States v. Christopher Fellini, NO. 20-CR-212 (D. Or.)**

Assaulted a federal law enforcement officer with a laser while the officer was performing his official duties, resisted arrest, and was found with pepper gel and a knife upon his arrest.

***United States v. Stephen Edward Odonnell,*** NO. 20-MJ00166 **(D. Or.)** Threw a hard object that struck a federal law enforcement officer in the face while the officer was performing his official duties.

**United States v.Nathan Onderdonk-Snow, NO. 20-CR-293 (D. Or.) (**Attachment 18)- Shoved a Deputy United States Marshal

from behind with a shield while the Marshal was performing his official duties and resisted arrest.

**United States v. Brodie Storey, NO. 20-CR-330 (D. Or.)** (Attachment 19)- Lunged at and tackled a Deputy United States Marshal while the Marshal was performing his official duties.

**United States v. Jeffrie Cary, NO. 20-CR-329 (D. Or.)** (Attachment 20)- Attacked a DeputyUnited States Marshal with a shield while the Marshal was performing his official duties.

**United States v. Jordan Matthew Johnson, NO. 20-MJ00179 (D. Or.) (Attachment 21)-** Attempted to grab a smoke grenade and struck a Deputy United States Marshal in the head while resisting arrest.

**United States v. Jesse Herman Bates, NO. 20-CR-245 (D. Or.) (**Attachment 22)- Shot medic in the chest with a metal ball bearing. Defendant was arrested with a crowbar.

**United States v. Michelle Peterson O'Connor, NO. 20-CR00023 (D. Or.) (**Attachment 23)- Struck a law enforcement officer in the head with a helmet and "rung his bell."

**United States v. William Grant Reuland, NO. 20-CR-460 (D. Or.)** (Attachment 24)- Engaged in civil disorder by shining lasers at various law enforcement officials.

**United States v. Travis Hessel, NO. 20-CR-450 (D. Or.)-** Arrested and later indicted for civil disorder by interfering with law enforcement officials engaged in their official duties. The details are unknown because the complaint was never unsealed.

**United States v. Richard Singlestad, NO. 20-MJ-00028 (D. Or.)-** Arrested for civil disorder by interfering with law enforcement officials engaged in their official duties. The details are unknown because the complaint was never unsealed.

**United States v. Pedro Aldo Ramos, Jr., NO. 20-CR-290 (D. Or.) (Attachment 25)-** Punched a law enforcement officer in the face. Defendant was charged with civil disorder.

**United States v. Kristopher Michael Donnelly, NO. 20-CR436 (D. Or.) (Attachment 26)-** Destroyed a police station window with a hammer and forcefully elbowed an officer in the face who attempted to arrest him. Defendant also was throwing frozen eggs and other hard objects at officers. Defendant was charged with civil disorder.

**United States v. Lillith Etienne Grin, NO. 20-CR-290 (D. Or.) (Attachment 27)-** Assaulted a Deputy United States Marshall with a laser, thereby affecting his vision "for 30 minutes after the incident" that resulted in "blurry vision and 'sunspots'" for the officer. Defendant also resisted arrest.

**United States v. Joshua Warner, NO. 20-CR-442 (D. Or.) (Attachment 2)-** Assaulted law enforcement officials by pointing a laser at their eyes and resisted arrest. Defendant was indicted for civil disorder.

**United States v. Charles Randolph Comfort, NO. 20-CR290 (D. Or.) (Attachment 28)-** Assaulted a law enforcement officer by repeatedly charging at him with a shield. Defendant was indicted for civil disorder.

**United States v. Alexandra Eutin, NO. 20-CR-459 (D. Or.) (Attachment 29)- *Struck a law enforcement officer in the head with a wood sign/shield while officer was attempting to arrest another rioter. Defendant was indicted for civil disorder.***

### 3. Portland Riot Cases with Extremely Favorable Plea Agreements

***United States v. Jeffrey Richard Singer*, NO. 20-CR-218 (D. Or.) (**Attachment 30)- Defendant had a "reoccurring role" in the Portland riots and charged at an officer who was trying to arrest him and injured the officer's thumb. Defendant also broke several windows at a private business and stole a United States flag. Although the defendant was charged with civil disorder and theft of government property, the civil disorder charge was dismissed, and Defendant was allowed to plead to simply stealing the flag. Because the government

"appreciated" the Defendant not engaging in further rioting after his arrest, it recommended a sentence of "time served" and one year supervised release.

### United States v. Anthony Amoss, NO. 21-MJ-00113 (D. Or.)

Defendant broke a window of the federal courthouse with a rock. The cost to replace windows was over $1,000 a piece. Defendant was allowed to plead to a citation only. 7 7 In the complaint against Amoss, the government noted: "Protest events in Portland are primarily attended by people in 'black bloc," a term used to describe the all black, nondescript clothing. ANTIFA and other groups have stated that the intent of wearing 'black block' is to protect members of the group willing to take 'direct action' by making it difficult for law enforcement to identify individuals and further anonymizing them ('direct action' is most often a criminal act of vandalizing property or assaulting people)."

### United States v. Carly Anne Ballard, NO. 20-MJ-000083 (D. Or.) (Attachment 31)- Resisted arrest by kicking a United States Marshal. Defendant was allowed to plead to a citation only.

**Garret Millier's counsel noted that, despite these serious attacks, assaults, and acts of vandalism against officers, these Portland rioters received very little jail time.** "From that review, it appears that approximately **74 persons** were charged with criminal offenses arising out of the riots.[5] Of those 74 persons, to date, approximately **30 persons** have had their cases dismissed (often with prejudice) upon motion of the government, **12 persons** appear to have been offered dismissals upon completing a pre-trial diversion program, and at least **3 persons** have been allowed by the government to plead guilty to significantly reduced charges."



## I.    DISCUSSION

While the government has "broad discretion" in "enforc[ing] the Nation's criminal laws," that discretion is, nevertheless, "subject to constitutional constraints." United States v. Armstrong, 517 U.S. 456, 465 (1996) (citations omitted). "One of these constraints, imposed by the equal protection component of the Due Process Clause of the Fifth Amendment" is that the government cannot pursue criminal charges against a citizen that amounts to a "'practical denial' of equal protection of law." Id. (citations omitted). Such a pursuit would give rise to a claim of "selective prosecution." Id. While "selective prosecution" claims generally involve claims of disparate treatment based upon race or

religion, it is clear that a claim of selective prosecution can be based upon the disparate treatment of those espousing different political viewpoints. It is clear that discriminatory enforcement of the law, by either state or federal officials, constitutes a denial of equal protection. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); Washington v. United States, 130 U.S.App.D.C. 374, 401 F.2d 915 (1968).

The primary way in which discriminatory law enforcement can be exhibited is by the use of the prosecutorial prerogative itself to discriminate against those whose constitutionally protected views or activities are not popular with the government (selective prosecution). United States v. Banks, 368 F.Supp. 1245, 1251 (D.S.D. 1973).



In the case of the Women's March, the organizers themselves publicly and explicitly admitted they were "planning to shut down the Capitol Building but the authorities were so scared" that they shut the Capitol down <u>for the organizers</u>.  Yet no charges of obstructing an official proceeding were ever levied against the organizers.



### SENTENCING REQUESTED BY DEFENDANT

Due to Mr. Todd's needs for treatment care, his mental health and PTSD challenges, and the need to avoid gross disparities compared with similarly situated offenders around the country, **Defendant Todd respectfully requests a sentence of two (2) year's probation with weekly counseling classes, no fine, and no restitution.**

Incarceration is **NOT** the appropriate sentence for a veteran suffering from mental illness and extensive mental trauma in addition to substance abuse issues. Defendant served this

honorable country in the United States Marine Corps for a time. To date, Defendant is a retired, honorable veteran, who was a hardworking and passionate carpenter shortly before incarceration in the present matter. Defendant has and continues to battle PTSD, military sexual trauma, anxiety, and depression. Rather than being afforded proper treatment and therapy, Defendant has been detained for the past four months and merely prescribed to take various drug therapies such as Prozac, Buspirone, Melatonin, Trazadone, Ambien, Remeron, and Requip. At current, Defendant faces twenty-years (20) of incarceration for mere petty offenses such as traffic violations as well as alcohol and drug offenses. Studies have shown that exposure to the criminal justice system negatively impacts the health of past drug users.[9] Moreover, there is a well-established link between incarceration and substance use—specifically, there is a higher likelihood of users returning to substance abuse after release from incarceration leading to overdoses and death.[10] While substance abuse can be treated while incarcerated, exposure to incarceration is likely to worsen already present mental health. Particularly, studies have supported the need from trauma-informed treatment rather than strictly incarceration.[11]

Defendant pleads with this honorable Court to not enforce his sentence of incarceration and instead make a downward departure from the government's twenty-year (20) sentence. This honorable Court maintains the discretion pursuant to the U.S. Sentencing Guidelines Manual §

[9] Hammock, J.A., López-Castro, T. & Fox, A.D., *Prior incarceration, restrictive housing, and posttraumatic stress disorder symptoms in a community sample of persons who use drugs*, HEALTH & JUSTICE 12, 20 (2024). https://doi.org/10.1186/s40352-024-00276-7.
[10] Belenko, S., Hiller, M., & Hamilton, L., *Treating Substance Use disorders in the Criminal Justice System*, CURRENT PSYCHIATRY REPORTS, 15(11) (2013). https://doi.org/10.1007/s11920-013-0414-z.
[11] Facer-Irwin E, Blackwood NJ, Bird A, Dickson H, McGlade D, Alves-Costa F, MacManus D., *PTSD in prison settings: A systematic review and meta-analysis of comorbid mental disorders and problematic behaviours*, NATIONAL LIBRARY OF MEDICINE, (Sept. 26, 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6762063/; *see also* Olga Cunha et al., *The Impact of imprisonment on individuals' mental health and society reintegration: study protocol*, BMC Psychology 11(215) (2023) https://bmcpsychology.biomedcentral.com/articles/10.1186/s40359-023-01252-w

5K2.0, 5K2.12, and 5K2.13. Specifically,  § 5K2.13 calls for a downward departure to further reflect the extent to which reduced capacity contributed to the commission of the crime "if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense." Reduced mental capacity "means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful."[12] Courts have clearly stated that § 5K2.13 "does not require that the reduced mental capacity be demonstrated to the sole, or 'but for,' cause of the commission of the offense."[13] Moreover, courts have held that a defendant's long history of mental illness establishes that they acted with significantly reduced mental capacity at the time an offense was committed and a departure from the sentencing guideline range—in this case twenty-years(20)—is warranted.[14]

Defendant's only intention is to deal with his mental health illnesses and substance abuse in a healthy manner. During the course of this matter, defendant had been admitted into a hospital for a suicide attempt. Upon release, Defendant voluntarily contacted the Veterans Administration for mental health treatment services. Subsequently, Defendant was receiving mental health treatment through Comprehensive Mental Health Services. Throughout his pretrial release, Todd maintained compliance with all of his mental health treatment conditions.

**CONCLUSION**

---

[12] The U.S. Sentencing Guidelines Manual § 5K2. 13.
[13] *United States v.* Speight, 726 F. Supp 861, 868 (1989)(holding that a veteran with a long-standing history of mental illness and substance abuse—that did not result from his addition to drugs—was substantially impaired under § 5K2. 13 and a downward departure was warranted.)
[14] *Id.*

For the foregoing reasons, the Defendant urges this Court to consider a sentence commensurate with the crime: a two-year (2) probation with weekly counseling classes. For incarcerated veterans, their involvement in the criminal legal system is a direct result of psychological complications that arose from their service.[15] Persons with mental illness are more likely to have a substance use disorder, which can lead to incarceration—that is what happened to Defendant. Empirical evidence shows that community-based treatment works for veterans and yields positive outcomes, including increased productivity, fewer suicides, and lower incarceration rates.[16] Defendant requests that this Court keep in mind, Todd maintains no intention to commit crimes but only dealing with mental health issues and beginning a road to recovery.

## CONCLUSION

### I.      CONCLUSION

Defendant's only intention is to deal with his mental health illnesses and substance abuse in a healthy manner. During the course of this matter, defendant had been admitted into a hospital for a suicide attempt. Upon release, Defendant voluntarily contacted the Veterans Administration for mental health treatment services. Subsequently, Defendant was receiving mental health treatment through Comprehensive Mental Health Services. Throughout his pretrial release, Todd maintained compliance with all of his mental health treatment conditions. For the foregoing reasons, the Defendant respectfully requests this Court to consider a sentence commensurate with the crime: a two-year (2) probation with weekly counseling classes, no fine, and no restitution.

**Dated: May 19, 2024**                                  **Respectfully Submitted,**

---

[15] Marisol Dominiguez-Ruiz, Kyle Virgien, and Corene Kendrick, *Our Veterans Need Support, Not Incarceration,* AMERICAN CIVIL LIBERTIES UNION, (Nov. 11, 2022) https://www.aclu.org/news/prisoners-rights/our-veterans-need-support-not-incarceration.
[16] *Id.*

**Dated: May 19, 2024**                    **Respectfully Submitted,**

/s/ *John M. Pierce*
John M. Pierce
21550 Oxnard Street
3rd Floor, PMB #172
Woodland Hills, CA 91367
Tel: (213) 400-0725
Email: jpierce@johnpiercelaw.com
*Attorney for Defendant*


Respectfully Submitted,

*/s/ Roger I. Roots*
Roger I. Roots
John Pierce Law, P.C.
21550 Oxnard Street
3rd Floor, PMB #172
Woodlands, Hills, CA 91367
rroots@johnpiercelaw.com
(662) 665– 1061
*Attorney for Defendant*